UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
Thekla Nordwind, Greta Hoerman,
and Gerald B. Taylor, as
Executor of The Estate of
Michael Franke,

                    Plaintiffs,


        -against-

DAVID J. ROWLAND, ROWLAND &
ASSOCIATES and ROWLAND &
PETROFF,

                    Defendants.
```
Civil Action No. 04-9725
(SDNY)(LTS)(AJP)

```
DAVID J. ROWLAND, ROWLAND &
ASSOCIATES and ROWLAND &
PETROFF,

    Third-Party Plaintiffs,


        -against-

PETER FRANKE-RUTA, WILLY
NORDWIND, JR., REED, STOVER &
O'CONNER, P.C., SQUIRE & DEMPSEY
L.L.P., CLIFFORD CHANCE
PARTNERSCHAFTSGESELLSCHAFT, and
COMMISSION FOR ART RECOVERY,
INC.

    Third-Party Defendants.
```

## OPINION

DONALD C. POGUE, Judge[1]: This action involves claims of legal
malpractice, breach of contract, negligence, breach of fiduciary
duty, and for equitable relief arising from Defendants' legal

---

[1]Sitting by designation.

representation of Plaintiffs Mrs. Nordwind, Ms. Hoerman, and Mr. Taylor as executor of the estate of Mr. Franke (collectively, "Plaintiffs"). Plaintiffs retained Defendants as counsel to assist in obtaining restitution for assets, originally belonging to their relatives Gustav and Clara Kirstein, that were confiscated by the Nazis. While representing Plaintiffs, Defendants contacted Ms. Christel Gauger[2] to inform her of her right to half of the recovery, and offered to represent her for that recovery - to which she agreed. (Ms. Gauger was a nurse to Erich Jacobsen whose wife, Gabrielle Jacobsen, inherited half the estate of the Kirsteins. The Jacobsen's son, Godfrey, left the residual of his estate to Ms. Gauger when he died.) Plaintiffs contend that Ms. Gauger does not have a right to half of the recovered assets, and that Defendants therefore should not have notified her, nor should Defendants have represented her without the Plaintiffs' informed consent, given that her interests were adverse to theirs. Before the court are cross-motions for summary judgment on all of the claims. The court resolves these issues by a ruling based on German law.

## BACKGROUND

As noted above, this case arises out of the parties' successful attempt to obtain restitution for various assets, including artwork, businesses and bank accounts (collectively, the

---

[2]Ms. Gauger is not a party to this action.

"Kirstein Assets"), that the Nazis confiscated from the estate of Clara Kirstein upon her death in 1939.  Defendants and Third-Party Plaintiffs David J. Rowland, Rowland & Associates, and Rowland & Petroff (collectively, "Defendants") represented Plaintiffs, Third-Party Defendant Peter Franke-Ruta, Mrs. Miriam Reitz Baer and Ms. Christel Gauger in their actions for restitution.

<u>History of the Kirstein Assets and Possible Heirs</u>

In the 1930s, Gustav and Clara Kirstein lived in Leipzig, Germany, which became part of East Germany when the post-war socialist country was established.  Gustav Kirstein predeceased his wife.  Upon his death, Gustav Kirstein left Clara Kirstein a life estate in his assets, and upon her death, the remainder was to go jointly to their two daughters, Gabrielle Jacobsen and Marianna Baer.  Clara Kirstein's estate also was to go jointly to their daughters upon her death, according to her will.  Both daughters immigrated to the United States in the 1930s, before Clara's death.

Prior to her death, Clara Kirstein paid a "Jewish Tax" to the Nazi government.  She made plans to emigrate to the United States, but died soon after her passport was confiscated and the Gestapo instructed her to report for deportation to Auschwitz.  Upon her death, the Nazi government confiscated her estate.

Marianna Baer, one of the Kirstein daughters, died in 1986 in New York state, survived by her only child, son Klaus Baer.  Klaus

3

Baer died in 1987, survived by his wife, Miriam Reitz Baer. Klaus Baer's will gave Miriam Reitz Baer a life estate in his assets, with the remainder to go to the Oriental Institute of the University of Chicago upon her death.  Miriam Reitz Baer and the Oriental Institute have assigned their inheritance rights to the Kirstein Assets to Plaintiffs and Third-Party Defendant Peter Franke-Ruta (collectively, the "Nordwind Parties"), in equal shares.[3]

The other Kirstein daughter, Gabrielle Jacobsen, was married to Erich Jacobsen, with whom she adopted their son Godfrey, an orphan from the Nazi concentration camp Theresienstadt.[4]  The Jacobsens lived and died in New York state.  Gabrielle Jacobsen died intestate in 1957.  Erich Jacobsen died in 1977, leaving Godfrey as heir to his estate.  Godfrey Jacobsen died in 1980.  He named Christel Gauger as Executor of his estate, leaving $20,000, his residence, and any remaining property that he owned at his time of death to her.  Pls.' 56.1 Statement of Undisputed Material Facts ¶ 19, citing Last Will & Testament of Godfrey Jacobsen, dated July 12, 1980 ("Pls.' 56.1 Statement").  Defendants contend, and Plaintiffs do not appear to dispute, that Godfrey Jacobsen thereby named Ms. Gauger as the residual heir to his estate.  Defs.' Resp.

---

[3] The Nordwind Parties are all nephews and nieces of Clara Kirstein.

[4] Theresienstadt is now known as Terezin, located in the Czech Republic.

and Objections to Pls.' 56.1 Statement ¶ 19.[5]

For the purposes of this action, the only relevant claims to the Kirstein Assets are those of the Nordwind Parties, nieces and nephews of Clara Kirstein who were assigned the inheritance rights of Miriam Reitz Baer and the Oriental Institute in the Kirstein Assets, and Christel Gauger, residual heir to Godfrey Jacobsen's estate.

Representation

Mrs. Nordwind spoke with Mr. Rowland about retaining his services to recover the Kirstein Assets in September, 1998, and entered into an agreement with him sometime between October and November, 1998.[6]   The agreement entitled Defendants to a contingency fee, which consisted of 20% of any recovery Plaintiff Nordwind made.   Mrs. Nordwind then furnished Mr. Rowland with the

_____

[5]The Nordwind Parties claim that under New York law, Godfrey Jacobsen could not have left his claims to the Kirstein Assets to Ms. Gauger, because those claims did not exist until they were created by law in 1990.

[6]The extent of the representation first agreed to, and the dates on which the agreement was made are also in dispute.   The Nordwind Parties contend that an attorney-client relationship existed as of October 1, 1998, based on a draft retainer agreement sent to Plaintiff Nordwind by Rowland, and accepted by way of a letter written by Mrs. Nordwind's husband.   Defendants contend that Rowland initially agreed only to investigate the possibilities for recovery, and that he did not agree to file a claim with the Conference on Jewish Material Claims against Germany, Inc. ("JCC" or "Claims Conference") until November 4, 1998, when the retainer agreement was signed.

materials she and her father had gathered that were related to the Kirstein Assets and inheritance rights therein.

After Mr. Rowland identified Miriam Reitz Baer as a potential heir, Mrs. Reitz Baer stated her willingness to assign her interest in the estate to the Nordwind Parties, which she subsequently did.[7] Mr. Rowland suggested to Mrs. Nordwind that each of Mrs. Nordwind, the Klaus Baer trust and "other possible Kirstein heirs" hire him, so that he would "be assured of representing heirs." Letter from Mr. Rowland to Mrs. Nordwind Re: Kirstein Business Property and Art Works, Nov. 3, 1998, Pls.' 56.1 Statement, Exh. 15. Mrs. Reitz Baer thereafter retained Mr. Rowland to represent her, prior to assigning her interests to the Nordwind Parties. Mr. Rowland was then also retained by the remainder of the Nordwind Parties.[8]

In researching the family history, Mr. Rowland obtained a copy of Godfrey Jacobsen's will, certified by the Clerk of Court from Monroe County, New York on November 17, 1998. Mr. Rowland testified in his deposition that upon reviewing Godfrey Jacobsen's will, Mr. Rowland determined that "the residual heir of the will was Christel Gauger." Pls.' 56.1 Statement ¶ 49 (citing Rowland

---

[7]The assignment was executed on 12/31/1999, though neither party states this. Pls.' 56.1 Statement, Exh. 8.

[8]Ms. Hoerman and Mr. Franke signed letter agreements on December 8, 1998 and December 16, 1998, respectively. Third-Party Defendant Mr. Franke-Ruta first assigned his rights to Mrs. Nordwind and gave her power of attorney to prosecute the claims on December 18, 1998, and then directly retained Rowland by letter agreement on July 15, 1999.

Dep. Tr. I at 162-68).

Mr. Rowland told Ms. Gauger that he believed she had an interest in the Kirstein Assets on or about December 3, 1998, and offered to represent her in their retrieval, to which she agreed in writing on December 16, 1998.  It is disputed whether Rowland had oral, informed consent of the Nordwind Parties to contact Gauger and offer his services.[9]  However, it appears to be undisputed that Mr. Rowland did not inform the Nordwind Parties that there was a

---

[9]It appears that the Nordwind Parties were under the impression that Ms. Gauger would assign them her interest in the Kirstein Assets, and that Mr. Rowland was aware of this possibility, at least as early as December 3, 1998, when Mr. Rowland wrote letters to Ms. Hoerman, Mr. Franke, and Mr. Franke-Ruta enclosing retainer agreements.  Those letters stated that "[b]oth Miriam Reitz [Baer] . . . and Christel Gauger have indicated that they may wish to assign their rights to Clare Kirstein's nieces and nephews at some time in the future."  See Letters from Mr. Rowland to Ms. Hoerman, Mr. Franke, and Mr. Franke-Ruta (Dec. 3, 1998) Pls.' 56.1 Statement, Exhs. 21-23; see also Letter to Ms. Christel Gauger from Mr. Rowland (Dec. 3, 1998) Pls.' 56.1 Statement, Exh. 27 ("[r]ather than make any decision at this time as to whether there should be a renunciation of the inheritance or an assignment (which could have potential tax implications), our thought was that my law firm should represent all heirs or possible heirs to begin pursuing the matter."); see also Letter from Thekla Nordwind to Christel Gauger (June 14, 1999) Rowland Aff. in Supp. Defs./Third-Party Pls.' Mot. Summ. J. Exh. K ("[w]hen we discussed the Kirstein estate last year, you said you would like to assign your rights as legal heir, to Clare Kirstein's nephews and nieces. . . .  If you have questions, or feel differently now, it would help to know . . . ."); see also e-mail from David Rowland to Thekla Nordwind (June 23, 1999) Rowland Aff. in Supp. Defs./Third-Party Pls.' Mot. Summ. J. Exh. J ("I am surprised to hear that Christel Gauger is not interested in making the assignment.  I have not spoken to her since last year when we filed the claim.  I will speak to her either tomorrow or when I am in Germany next week.").

potential conflict of interest between them and Ms. Gauger, nor did he obtain signed waivers of any conflict of interest from the Nordwind Parties.   Mr. Rowland contends that he "did not have a duty to advise Mrs. Nordwind of any 'conflict or potential conflict between her claims to the Kirstein Assets and the claims of other possible heirs,' because there were no conflicts or potential conflicts."   Defs.' Resp. Pls.' 56.1 Statement ¶ 31.

Mr. Rowland represented Ms. Gauger in her application for an *Erbschein* (a German certificate of inheritance).   Mr. Rowland filed the application for the *Erbschein* after determining that Ms. Gauger was the residual heir to the estate of Godfrey Jacobsen, according to Jacobsen's will, and that she was therefore heir to 50% of the Kirstein Assets.   There is a mechanism to dispute the issuance of an *Erbschein*, about which Mr. Rowland did not inform the Nordwind Parties; Defendants claim that such an action was never relevant nor contemplated.

Mr. Rowland also represented the Nordwind Parties, Mrs. Reitz Baer, The Oriental Institute and Ms. Gauger before the Claims Conference in their bid for restitution of the Kirstein Assets, but filed claims only for Mrs. Reitz Baer and Ms. Gauger.[10]   The Claims

---

[10]The Claims Conference does not recognize assignments of claims. <u>See, e.g.</u>, Letter from I. Koenig & K. Hermann, Claims Conference, to David Rowland, Esq. (Apr. 4, 2005) <u>Pls.' 56.1 Statement</u>, Exh. 41 ("[a]ny assignments of claims by heirs among each other or to third parties are not recognized by us and are not given any consideration in rendering payment.").

Conference made an award of restitution for certain of the Kirstein Assets in February, 2003. Fifty percent of this award was paid to Ms. Gauger by the Claims Conference. There was also a recovery of artwork, which was auctioned; fifty percent of those proceeds also went to Ms. Gauger. In January, 2004, the Swiss Claims Resolution Tribunal ("CRT") awarded Mrs. Reitz Baer and Ms. Gauger approximately $130,000 for bank accounts previously owned by the Kirsteins.

The Nordwind Parties contend that it was unnecessary for Ms. Gauger to be joined in the claim filed with the Claims Conference. Pls.' 56.1 Statement ¶ 142-143. Defendants contend that, had Ms. Gauger not joined the claim, the Nordwind Parties (by way of Mrs. Reitz Baer) would still only have recovered the fifty percent to which Mr. Rowland contends they were entitled. For that reason, and because Plaintiffs thought Ms. Gauger would assign her rights to them, Mr. Rowland contends that including Ms. Gauger in the claim was the course of action more likely to result in a larger payout for the Nordwind parties. Defs.' Resp. Pls.' 56.1 Statement ¶ 142-143.[11]

---

[11]There was a time constraint on any parties contemplating filing claims; due to an amendment to the Rules, Ms. Gauger would not have recovered anything from the Claims Conference if she had filed later than December 31, 1998. Defendants contend that her 50% recovery would have been lost entirely had she not filed a claim. See also, Letter from I. Koenig & K. Hermann, Claims Conference, to David Rowland, Esq. (Apr. 4, 2005) Pls.' 56.1 Statement, Exh. 41 ("[i]f only one of several co-heirs in a

(continued...)

The Nordwind parties also filed claims relating to Swiss Bank accounts owned by the Kirsteins before the Swiss Claims resolution Tribunal ("CRT").  Mrs. Nordwind represented the Nordwind Parties. There is dispute as to her discussions and agreements with Ms. Gauger before the claims were filed.  Defendants claim that Ms. Gauger had consented to Mrs. Nordwind filing at the CRT, but had not consented to be joined (or to participate at all), and had not agreed to assign her interest from any recovery to the Nordwind Parties.  The Nordwind Parties contend that Ms. Gauger had agreed to assign her interest to them, and had agreed to sign over her power of attorney to Mrs. Nordwind, but that when Mr. Rowland, at the request of Mrs. Nordwind, contacted Ms. Gauger, the situation ended with Mr. Rowland representing Ms. Gauger and writing to the CRT to contest the award to the Nordwind Parties, and obtain a recovery for Ms. Gauger of 50% of the award from the CRT. Defendants claim that Mr. Rowland was just alerting the CRT to an administrative error.  Mr. Rowland received 20% of Ms. Gauger's award.

Defendants' representation of Plaintiffs terminated in or just after December, 2003.  Defendants retained files relevant to the case despite Mrs. Nordwind's request for those materials after

---

[11](...continued)
community of heirs submits a claim, he/she will participate only to the extent of the share in his/her inheritance.  The other shares remain with our organization.").

termination of their lawyer-client relationship.   Mr. Rowland argues that he had a right to retain the files pursuant to a charging lien for the work he had already done.[12]

## JURISDICTION

The parties to this action are diverse, and the amount in controversy exceeds $75,000.  Therefore, the court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a).   The claims brought are New York state law claims for breach of contract, breach of fiduciary duty, negligence, and legal malpractice, in addition to claims for restitution and unjust enrichment.

## ANALYSIS

The Nordwind Parties' argument rests on their contention that they had a "colorable claim" to all of the Kirstein Assets, and that Defendants, who represented the Nordwind Parties, should therefore have obtained informed consent before commencing representation of Ms. Gauger, whose claims to the assets were adverse to theirs.   The Nordwind Parties base this claim on an interpretation of the 1990 Vermögensgesetz ("German Property Claims Act" or "GPCA").   Because Godfrey Jacobsen died ten years before

---

[12]Given Defendants' consented-to withdrawal without prejudice of counterclaims for breach of contract and quantum meruit, discussed infra, the court assumes that the parties have come to some agreement as to any files which the Nordwind Parties have yet to obtain from Defendants.

the GPCA was passed in 1990, the Nordwind Parties argue that they had a colorable claim to all of the assets, based on their theory that claims for restitution were not passed to Ms. Gauger through the Jacobsen will, because under New York state law, a statutory claim cannot pass from an estate until the effective date of the statute, and claims acquired posthumously cannot be devised by will.

The Nordwind parties argue that this interpretation of the facts and law constitutes at least a colorable claim which would strip Ms. Gauger of a right to restitution, and that the possible legal validity of the Nordwind Parties' claims creates a sufficient conflict of interest so that Defendants should have obtained the Nordwind Parties' informed consent before agreeing to represent and representing Ms. Gauger.

The Nordwind Parties move for Summary Judgment, claiming that Defendants breached their fiduciary duty to the Nordwind Parties. Defendants' Cross-motion for Summary Judgment claims that the breach of fiduciary duty claim was duplicative of the claim for legal malpractice, which was in turn ill-founded, and should therefore be dismissed.

I. Dismissal of Claims for Breach of Fiduciary Duty, Breach of Contract and Negligence as Duplicative of the Legal Malpractice Claim

Under New York law, where a claim for fiduciary duty is "premised on the same facts and seeking the identical relief" as a claim for legal malpractice, the claim for fiduciary duty "is redundant and should be dismissed." Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc., 780 N.Y.S.2d 593, 596 (App. Div. 2004); accord Ciocca v. Neff, 2005 WL 1473819, at *5 (S.D.N.Y. June 22, 2005); see also Serova v. Teplen, 2006 WL 349624, at *4 (S.D.N.Y. Feb. 16, 2006). Here, the claim for breach of fiduciary duty is based on Mr. Rowland's alleged breach of his duties of loyalty, zealous representation, and confidentiality when, without the informed consent of the Nordwind Parties, already his clients, he contacted Ms. Gauger, advised her that he believed she had a claim to the Kirstein Assets, and represented her to the alleged detriment of the Nordwind Parties. These are the same facts that form the basis for the breach of contract, negligence and legal malpractice claims. See Second Amended Complaint and Jury Demand 3.[13] The damages alleged, $20 million, are also identical for these

---

[13]The Nordwind Parties argue that the different claims are based on different sets of facts. According to the Nordwind Parties, their claim for breach of fiduciary duty is based on Mr. Rowland having represented the Nordwind Parties and Ms. Gauger "without having first obtained any informed waiver of a conflict of interest," and that this constituted a breach of fiduciary duty because there was a conflict between their competing claims, given that the Nordwind Parties' experts have shown them to have claims to 100% of the Kirstein Assets that at least have a reasonable basis in law and fact. Amended Reply Mem. Supp. Mot. Summ. J. by Ps & Third-Party D. Ruta 3-4 ("Pls.' Am. Reply Mot. Summ. J.") 3-4. In contrast, according to the Nordwind Parties,
(continued...)

claims. Id. at 4.

The Nordwind Parties argue, however, that a claim for breach of fiduciary duty carries a different standard of proof than a claim for malpractice, and that therefore, their claim is "not duplicative of the legal malpractice claim even when both claims arise from the same underlying legal representation." Amended Reply Mem. Supp. Mot. Summ. J. by Pls. & Third-Party Def. Franke-Ruta 2 ("Pls.' Am. Reply Mot. Summ. J.")(citing Ciocca v. Neff, 2005 WL 1473819); see also Mem. of Law of Pls. and Third-Party Def., Franke-Ruta, in Opp. to Defs.' Mot. for Summ. J. 10 ("Pls.' Opp. Defs.' Mot. Summ. J."). Specifically, the Nordwind Parties argue that a breach of fiduciary duty claim requires a showing that the lawyer's misconduct was a "substantial factor" in the client's loss, rather than the higher, "but-for" causation standard required to prove legal malpractice. Pls.' Am. Reply Mot. Summ. J. at 3 (citing Ciocca v. Neff, 2005 WL 1473819 at *6).

Under New York law, however, courts do not "differentiate[] between the standard of causation requested for a claim of legal malpractice and one for breach of fiduciary duty in the context of

---

[13](...continued)
the legal malpractice claim "turns on whether Mr. Rowland rendered faulty advice that fell below the standard of care, and is not premised upon his conflict of interest." Id. However, the advice to which the Nordwind Parties refer was rendered regarding decisions to contact Ms. Gauger and inform her of her potential claim, and to have Mr. Rowland represent Ms. Gauger—namely, the same set of facts and interactions that lead to the claim of legal malpractice.

attorney liability." <u>Weil, Gotshal & Manges, LLP</u>, 780 N.Y.S.2d at 596; <u>see also</u> <u>Schneider v. Wien & Malkin LLP</u>, 2004 WL 2495843 at *17, n. 10 (N.Y. Sup. Nov. 1, 2004)(explaining that the higher "but for" standard of causation applies only to breach of fiduciary duty claims premised on allegations of legal malpractice); <u>see also</u> <u>Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP</u>, 2007 WL 2219485, at *3 (S.D.N.Y. Aug. 2, 2007)(in case alleging lawyer's breach of fiduciary duty, "but for" standard of causation applies). In <u>Ciocca</u>, the court dismissed claims for breach of contract which arose "from the same facts and alleged legal obligations" as a legal malpractice claim that centered on the defendant's representation of the plaintiff in the sale of a patent and defendant's allegedly overlapping representation of the entity to whom the patent was sold without informed consent. <u>Ciocca v. Neff</u>, 2005 WL 1473819 at *5. In that case, the court did not dismiss the claim for breach of fiduciary duty, finding that the claim was not duplicative. There were, however, two parts to the factual basis for the claim for breach of fiduciary duty: (1) the alleged overlapping representation, and (2) defendant's demand for an interest in the patent sale as repayment for his previous patent prosecution. <u>Id.</u> The court found that the breach of fiduciary duty claim was not duplicative of the legal malpractice claim for the dual reasons that the "standard of proof applicable to the fiduciary duty claim is different from that pertinent to the

malpractice claim," Id. at 6, and because the demand for payment was a separate fact from those alleged in support of the legal malpractice claim. Id. Although the court incorrectly stated that the level of causation necessary to prove the breach of fiduciary duty claim was the "substantial factor" level, the holding did not rely on that statement, because the additional fact, that was part of the claim for breach of fiduciary duty, rendered the claim not duplicative. Accordingly, Plaintiffs' and Third-Party Defendant Franke-Ruta's claims for breach of fiduciary duty, breach of contract and negligence will be dismissed as duplicative of the legal malpractice claim.

II. Legal Malpractice Claim

The four elements of a legal malpractice claim in New York are (1) an attorney-client relationship, (2) attorney negligence, which is (3) the proximate cause of (4) actual damages. Flutie Bros. LLC v. Hayes, 2006 WL 1379594, at *5 (S.D.N.Y. May 18, 2006); Estate of Re v. Kornstein Veisz & Wexler, 958 F.Supp. 907, 920 (S.D.N.Y. 1997). Defendants do not argue about the first three elements of malpractice, but rather argue that summary judgment is appropriate based on their contention that the Nordwind Parties were not damaged.

Here, ruling on matters of foreign law, Fed. R. Civ. P. 44.1, and considering facts plead in the complaint in the light most favorable to the non-moving parties, Matsushita Elec. Indus. Co. v.

16

<u>Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), the court finds that damages cannot be proved, and so Defendants are entitled to judgment as a matter of law.

Defendants move for the dismissal of the legal malpractice claim as a matter of law; therefore, all factual inferences are drawn in favor of Plaintiffs.  However, interpretation of foreign law is a matter of law, which is for the court to decide.[14] Fed. R. Civ. P. 44.1.  As noted, in this case, the interpretation and application of foreign law is dispositive.  If the Nordwind Parties were entitled to 100% of the Kirstein Assets, then the question before the court would be whether they have pointed to sufficient evidence to show that Mr. Rowland was negligent in concluding that the Nordwind Parties were only entitled to 50% of the assets, and Ms. Gauger to the other 50%.[15]  However, if the Nordwind Parties were entitled to 50% or less  of the Kirstein Assets, then the Nordwind Parties are not damaged by Defendants' representation of Ms. Gauger without their informed consent, and cannot prevail on a claim for legal malpractice as a matter of law.

---

[14]For this reason, the court will examine all relevant materials to make its determination.  The court therefore denies Plaintiffs' Cross-Motion to Strike New Krane Affidavit, and accepts Plaintiffs' proffered Reply Report of Bruce A. Green.

[15]Defendants agree that if Ms. Gauger were not entitled to 50% of the Kirstein Assets, as they argue she is, "there are factual issues regarding whether Rowland met the standard of care . . . ."  Defs.'/Third-Party Pls.' Reply Mem. of Law in Further Supp. Mot. Summ. J. 3, at n. 2.

The German Property Claims Act became law in 1990. The GPCA created claims for restitution of property that was lost through confiscation or forced sale and nationalization. The GPCA analogously provides restitution for people who were persecuted and wrongly deprived of property on racial, political, religious or ideological grounds in the period from January 30, 1933 to May 8, 1945, provided those affected timely filed their claims. GPCA § 1(6).[16] The GPCA defines eligible parties to be "individuals . . . whose assets are affected by measures in accordance with § 1, as well as their legal successors." GPCA § 2(1). Claims for restitution under the Act had to be filed by June 30, 1993 for moveable assets. No one filed a claim for the Kirstein Assets prior to this deadline, thus, no recovery could have been had directly under the GPCA.

The Claims Conference was named by the GPCA as successor for those properties and assets unlawfully taken from Jews during the Holocaust that had been identified but not timely claimed under the GPCA. GPCA § 2(1), Aff. Debra Brodian Bernstein in Supp. Defs.'/Third-Party Pls.' Mot. Summ. J. Exh. 35 ("Bernstein Aff.").

---

[16]That section provides:
This law is to be applied analogously to financial claims of citizens and associations who, during the period of January 30, 1933 to May 8, 1945, were persecuted for reasons of racism, political views, religion or ideology and therefore lost their assets due to forced sales, expropriations or in other ways. GPCA § 1(6).

The Claims Conference is an organization that provides aid to Holocaust survivors throughout the world, and had been involved in negotiations to allow recovery for Jewish asset owners under the GPCA.[17]  The Claims Conference established a Goodwill Fund for those who did not file claims before the GPCA deadline.  Distributions from the Goodwill fund were to be made to those who would have recovered under the GPCA, and who furthermore met the requirements of rules promulgated by the Claims Conference.  Mr. Rowland filed claims with the Claims Conference Goodwill Fund on behalf of Ms. Gauger and Mrs. Reitz Baer, and he represented to the Claims Conference that Ms. Gauger was entitled to 50% of the Kirstein Assets and that Mrs. Reitz Baer was entitled to 50%, as discussed above.

Thus, a determination of which of the possible successors had a right to recover from the Goodwill Fund requires a determination of the meaning of "legal successor" under the GPCA in addition to an examination of the Claims Conference Rules.

Experts for both parties agree that the GPCA defines legal

---

[17]Programs of the Claims Conference are detailed on their website, which explains the organization's general activities as follows:

> Since 1951, the Claims Conference - working in partnership with the State of Israel - has negotiated for and distributed payments from Germany, Austria, other governments, and certain industry; recovered unclaimed German Jewish property; and funded programs to assist the neediest Jewish victims of Nazism.

Claims Conference website, available at: http://www.claimscon.org

successors according to the inheritance rules of the place in which the deceased lived (which, for the relevant parties, was New York state).  However, the Nordwind Parties' experts contend that this points to the inheritance laws of New York, applied to the estate at the time the restitution claim was created, to see how the <u>claim</u> would be passed, Mem. of Law Supp. Mot. Summ. J. by Pls. & Third-Party Def. Ruta 16-17 ("<u>Pls.' Mot. Summ. J.</u>"), while the Defendants' experts argue that the GPCA instructs application of the inheritance laws to determine who would have inherited the <u>assets</u> had they not been unlawfully confiscated. Defs.'/Third-Party Pls.' Reply Mem. of Law in Further Supp. Mot. Summ. J. 6 ("<u>Defs.' Reply Mem. Supp. Mot. Summ. J.</u>").

The Nordwind Parties' argument is that (1) the claim for restitution was created by the GPCA and did not exist before 1990, <u>Pls.' Mot. Summ. J.</u> at 14; (2) under the GPCA, claims arose directly in the estate of the injured party or their "legal successor," <u>id.</u> at 15; (3) legal successors must be identified according to the GPCA, which indicates the use of New York law in this case, <u>id.</u>; (4) Gabrielle Jacobsen, her spouse and her issue were dead in 1990, <u>id.</u> at 16; (5) New York law, as applied here, only allows transfer of cognizable property claims during life or upon death, so that the GPCA claims would not pass to Ms. Gauger through Erich Jacobsen's or Godfrey Jacobsen's wills, as the claims were never theirs to will away upon death <u>id.</u> at 17; and (6) that

20

New York intestacy law, applied to Gabrielle Jacobsen's estate as
of 1990, would cause the claims to pass to the Nordwind Parties.[18]
Id.

Defendants dispute the Nordwind Parties' determination of
"legal successor" as described in (3), and therefore dispute that
(5) and (6) are applicable. Defendants explain that "the issue of
whether a claim could have passed through Godfrey Jacobsen's Will
is irrelevant with respect to this motion, because that is not how
'legal successors' are determined under the German Property
[Claims] Act." Defs.' Reply Mem. Supp. Mot. Summ. J. 4.
Specifically, Defendants contend that the correct interpretation of
"legal successors" meets the purpose of the GPCA "to compensate,
for the injustice of the confiscation of assets, those parties who
have suffered such injustice or who - without the confiscation
having occurred - would have assumed the position of the injured
party." Id. at 6. Defendants further explain their position that,

_____

[18]The conclusion that the Nordwind Parties would be entitled
to recovery under New York intestacy law as applied in 1990 is
reached in the following way, according to the Nordwind Parties'
expert:

> A domiciliary of New York State at her death, the
> determination of the identity of Gabrielle's heirs is
> governed by [New York estates, Powers and Trusts Law]
> section 4-1.1 as it read in 1990, Gabrielle not being
> survived at that time by spouse, issue, parents or
> issue of parents, her distributees were the only living
> descendants of her grandparents, her cousins, Michael
> Franke, Peter Paul Franke-Ruta, Thekla Nordwind and
> Greta Hoerman.

Pls.' Mot. Summ. J. 17 (citation omitted, emphasis omitted).

under the GPCA, "the lines of inheritance are followed as if,
hypothetically, the assets were never confiscated, in order to
determine who the heirs are." Id. at 8.   Thus, Defendants argue
that claims to restitution for the Kirstein Assets originated in
1990 with those people who would have had an interest in the
Kirstein Assets had they not been confiscated, and had those assets
instead passed through the chain of inheritance according to the
laws of the state of residence of each decedent.   Defs.'/Third-
Party Pls.' Mem. Law in Opp. Pls.' & Third-Party Def. Franke-Ruta's
Mots. Summ. J. 20 ("Defs.' Opp. Mem.").    New York law then
determines who the residual beneficiary of each relevant estate
was, which, in the case of the Gabrielle Jacobsen line of
inheritance, was ultimately Ms. Gauger.

Defendants' argument is supported by the law.   As stated
above, the GPCA defines eligible parties to be "individuals . . .
whose assets are affected by measures as defined in § 1, as well as
their legal successors." GPCA § 2(2).   All parties agree that the
determination of legal successors under the GPCA is central to a
determination of the proper rights-holders.   According to a legal
commentary, when the injured persons are deceased, "the claim has
then arisen in the [legal successor's] person directly and
originally," and the identity of the legal successors "is
determined on the basis of the law of succession provisions of the
pertinent lex successionis" 7 Beck's Brief Commentaries, vol. 5,

section 1 (65th ed., Verlag C.H. Beck 2006)(citing §1922 of the German Civil Code), Bernstein Aff. Exh. 44.  Thus, the GPCA causes the claim for restitution to originate with the legal successors, and not, as the Nordwind Parties argue, to be passed down from the estate of the injured party as of 1990.   However, the Nordwind Parties are correct that New York law governs the identification of the legal successors, as New York is the lex successionis for Gabrielle Jacobsen (and her sister, Marianna Baer).   Thus, the claim for restitution arose directly and originally in the legal successors of Gabrielle Jacobsen and Marianna Baer.   New York probate law has already determined that Gabrielle's property was passed intestate to Erich Jacobsen, whose residual beneficiary was Godfrey Jacobsen, whose residual beneficiary, in turn, was Christel Gauger.   The claim for restitution for 50% of the Kirstein Assets therefore arose directly and originally in Ms. Gauger in 1990. Likewise, Ms. Reitz Baer had a claim to a life interest in the other 50% of the assets.

This interpretation of the GPCA is further supported by a determination of the German Federal Administrative Court regarding the position of a testamentary heir as a legal successor. Bundesverwaltungsgericht [BVerwG] [Federal Administrative Court] Sept. 7, 1998, BVerwG 8 B 118.98, Bernstein Aff. Exh. 39.   The court in that case  held that

> [t]he testamentary heir of the injured party, as the
> latter's legal successor, is the eligible party within

23

the meaning of [GPCA § 2(2)], because he succeeded to the
injured party's legal position to the full extent and
therefore the hypothetical assumption is justified that
the confiscated <u>asset</u> is to be attributed to him under
civil law, had it not been taken away from the injured
party on the basis of illegal measures within the meaning
of [GPCA § 1] . . . .

<u>Id.</u> (citations omitted, emphasis added).[19]  The court explains that

as a matter of German law, the claim first comes into being with

the legal successor of the injured party (if the injured party is

deceased), and that the legal successor is determined by a legal

analysis of who would have inherited the asset, had it not been

confiscated.  Only then is New York law consulted, to determine who

would have inherited the assets, had they not been confiscated, but

rather, passed through the chain of heirs as described above.

_____

[19]That case further explains that:
the legal succession to the confiscated asset must be
determined only hypothetically by way of an implication
in law . . . .  After all, [GPCA § 2 I 1] evidently has
the purpose to provide for compensation - <u>in personam</u> -
for the illegal situation created by the expropriation
and to the extent possible restore the <u>status quo ante</u>.
Accordingly the BverwG saw the reason and purpose of
the legal provision in the fact "that the asset, had it
not been confiscated from the injured party by illegal
means as defined in [GPCA § 1], would have been
transferred to the intestate or testate heir at the
death of the testator, together with the other assets
forming part of the estate . . ." and that "because of
this hypothetical transfer of assets . . . the illegal
situation, which was created by the expropriation and
for which the [GPCA] is to provide compensation,
continues also in the person of the heir, whom the
legislator, for that reason, declared a party eligible
for the claim."
BVerwG 8 B 118.98 at 2(a)(citing BVerwG, Buchholz 428 § 2 [GPCA]
no. 23, page 30), <u>Bernstein Aff.</u> Exh. 39.

Thus, the Nordwind Parties did not have an entitlement under the GPCA to the 50% of the Kirstein Assets that originally would have gone to Gabrielle Jacobsen. As a result, the Nordwind Parties were not eligible for restitution of that 50% under the Goodwill Fund rules, or for the 50% of the CRT recovery. It follows that where there was no entitlement, there was no damage done to the Nordwind Parties when they did not receive those monies. The court need not reach the other elements of the legal malpractice claim, as the claim fails as a matter of law for failure to prove damages.

III. The Nordwind Parties' Unjust Enrichment Claims

Defendants further move for Summary Judgment on the Nordwind Parties' claims of unjust enrichment for fees paid, and for an injunction disallowing his further representation of Ms. Gauger based on a continuing breach of New York professional responsibility rules 22 NYCRR § 1200.19 and 22 NYCRR § 1200.27.[20] Here, where the underlying claim for legal malpractice is dismissed based on a finding that the Nordwind Parties suffered no legally cognizable damages, the court finds it inappropriate to further consider Plaintiffs' requests that the court order Defendants to discharge all fees collected on already-recovered property. Although the Nordwind Parties argue that Defendants used

---

[20]Accepting the facts as plead, the relief sought in these claims is equitable in nature, and within the discretion of the court to grant.

confidential information to pursue an attorney-client relationship
with Ms. Gauger, and although information may be confidential even
if it is available through public records, at this point in the
proceedings, the court considers that relevant information has
become generally known.   Moreover, this allegedly "confidential"
information did not relate to the Nordwind Parties but to Ms.
Gauger. See, e.g., Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer,
Inc., 188 F.R.D. 189, 199, n. 14 (S.D.N.Y. 1999)(confidential
client information is defined to consist of "information relating
to that client, acquired by a lawyer or agent of the lawyer in the
course of or as the result of representing the client, other than
information that is generally known." (quoting Restatement (Third)
of the Law Governing Lawyers § 111 (Proposed Final Draft No. 1
1996)).   The legal determination of this court, based on the record
before it, that Ms. Gauger is entitled to a 50% share of the
Kirstein Assets, does not allow for an interpretation of facts such
that the Nordwind Parties would be entitled to payment from
Defendants for retention of the benefits of previously confidential
information that lead to the identification of Ms. Gauger as an
heir.   Therefore, because of the legal constraints established by
the court's other rulings and, drawing all factual inferences
against the Defendants, the court will not disturb Mr. Rowland's
contractual agreement, either post-hoc or through restrictions on
further representations, with Ms. Gauger - a non-party who cannot

represent her interests before this court.


IV. Defendants' Counterclaims against Plaintiffs and Franke-Ruta
for Breach of Contract and Quantum Meruit

Defendants move for Summary Judgment on their cross-claim for breach of contract, and in the alternative, for payment under a theory of quantum meruit for work done towards recovery of items that have not yet been recovered. However, during oral argument, Defendants expressed their intention to withdraw these counterclaims, subject to the withdrawal being without prejudice. The parties have subsequently agreed, and the counterclaims have therefore been dismissed.


V. Indemnification Claims Against Third-Party Defendants

Third-Party Defendants Willy Nordwind and Reed, Stover & O'Connor ("Reed, Stover") move for summary judgment dismissing Defendants' claims for indemnification, based on an argument that there was never an attorney-client relationship between Mr. Nordwind, Reed, Stover and any of the Nordwind Parties. Likewise, Third-Party Defendants Squire, Sanders & Dempsey, LLP ("Squire, Sanders") and Commission for Art Recovery, Inc. ("CAR") move to dismiss Defendants' claims for indemnification, based on an argument that any liability found in this case would arise from Defendants' wrongdoing, thus making unavailable a common law claim

for indemnification, and that there is no evidence in the record of contractual indemnification.   Lastly, Third-Party Defendant Clifford Chance Partnerschaftsgesellschaft moves for summary judgment dismissing Defendant's claim for indemnification with the same arguments as Squire, Sanders and CAR, that there is no contractual indemnification, and common law indemnification is inappropriate where the lawsuit was based on Mr. Rowland's allegedly tortious behavior.

Despite the possible merit of the arguments against indemnification, because the court finds that the Nordwind Parties suffered no legally cognizable damages, the issue of indemnification is moot.


VI. Third-Party Defendants Claims for Abuse of Process

Defendants move for dismissal of the abuse of process claims brought by Third-Party Defendants, based on an argument that the filing of a civil suit cannot support a claim for abuse of process, and further arguing that because the allegedly wrongful acts were directed at someone other than the complaining party, third-party defendants have no standing to bring their claim.

In New York, an "abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a

28

collateral objective that is outside the legitimate ends of the process." <u>Cook v. Sheldon</u>, 41 F.3d 73, 80 (2d Cir. 1994)(citing <u>Curiano v. Suozzi</u>, 469 N.E.2d 1324, 1326 (N.Y. 1984); <u>Board of Educ. of Farmingdale v. Farmingdale Classroom Teachers Ass'n</u>, 343 N.E.2d 278, 282 (N.Y. 1975)). Thus, New York requires more than the mere filing of a suit, even for an improper motive, as the basis for a claim for abuse of process. <u>See</u> <u>Curiano v. Suozzi</u>, 469 N.E.2d at 1326. In <u>Curiano v. Suozzi</u>, the court explained that the "gist of the abuse of process" claim was "the improper use of process after it is issued." <u>Id.</u> (citations omitted).

Here, the Third-Party Defendants allege that process was abused by filing suit and subsequently using that wrongful filing to pressure Plaintiffs for an unreasonable settlement amount, inter alia. This attempt at unfair settlement, Third-Party Defendants contend, constitutes a collateral objective to the use of civil process sufficient to form a claim for abuse of process. However, Third-Party Plaintiffs fail to articulate how the complaint itself compelled performance or forbearance of an act other than the act of Third-Party Defendants defending themselves.[21] Although the act

---

[21]For example, Third-Party Defendants argue that claims for indemnification were filed against:

> plaintiff's husband, the husband's former law firm, and the non-profit organization and two law firms that the plaintiffs credited with recovering their family's confiscated artwork. The third-party indemnification claims were asserted . . . for the wrongful purpose and collateral objective of harassing the plaintiffs, pressuring them to
>
> (continued...)

of bringing suit was allegedly directed to harass and inconvenience
the Nordwind Parties, there was no legal compulsion to settle.
See, Williams v. Williams, 246 N.E.2d 333, 335 (N.Y.
1969)(dismissing claim that filing complaint and then mailing
copies to multiple people in the trade constituted abuse of process
because "there must be an unlawful interference with one's person
or property under color of process in order that action for abuse
of process may lie"); see also, Board of Educ. of Farmingdale, 343
N.E.2d 278 (abuse of process claim was properly brought where
defendant issued subpoenas for 87 teachers to appear on the same
day and refused to stagger those appearances, causing plaintiff
school board to hire substitute teachers for numerous classes).
Thus, Third-Party Defendants do not allege a wrongful action made
"under color of process," and their claim cannot stand.   As
Defendants have noted, if there were unlawful interference,
Third-Party Defendants may be able to bring a claim for malicious
prosecution upon the conclusion of this action, and allegations of
filing the complaint for the purpose of strong-arming Plaintiffs
into settlement could be appropriately considered at that time.

---

[21](...continued)
settle for an unreasonable amount, and causing them to incur
additional and unnecessary expenses in pursuing their
claims.
Mem. of Law in Opp. to Third-Party Pls.' Mot. for Summ. J. by
Third-Party Defs. Squire, Sanders & Dempsey LLP, Commission for
Art Recovery, Inc., Willy Nordwind, Jr. And Reed, Stover &
O'Connor, P.C. 6.

For the reasons discussed above, the claim for abuse of process will be dismissed.

CONCLUSION

For the reasons discussed above, Plaintiffs' and Third-Party Defendant Franke-Ruta's claims for breach of fiduciary duty, breach of contract, and negligence are incorporated into their claim for legal malpractice, and will therefore be dismissed; Defendants' motion for summary judgment on the claim for legal malpractice is granted; Plaintiffs' and Third-Party Defendant Franke-Ruta's claims for restitution and unjust enrichment is dismissed; Defendants' motion for summary judgment of breach of contract or, in the alternative, quantum meruit has been dismissed without prejudice; Third-Party Defendants Willy Nordwind, Jr.'s, Reed, Stover & O'Connor, P.C.'s, Squire, Sanders & Dempsey L.L.P.'s, Clifford Chance Partnerschaftsgesellschaft's, and Commission for Art Recovery, Inc.'s motions to dismiss Defendants' claims for indemnification are granted; and Defendants' motion to dismiss Third-Party Defendants' claims for abuse of process is granted. SO ORDERED.

_____
Donald C. Pogue, Judge

Dated:   October 10, 2007
         New York, New York